JENNIE LEE ANDERSON (SBN 203586)
ANDRUS ANDERSON, LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474
jennie@andrusanderson.com

W. DANIEL MILES, III (*pro hac vice* forthcoming)
JAMES EUBANK (*pro hac vice* forthcoming)
LESLIE L. PESCIA (*pro hac vice* forthcoming)
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, Alabama 36104
Telephone: (800) 898-2034
Facsimile: (334) 965-7555
dee.miles@beasleyallen.com
james.eubank@beasleyallen.com
leslie.pescia@beasleyallen.com

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH GWALTNEY, individually and as representatives on behalf of a class of similarly situated persons,<br><br>                    Plaintiff,<br><br>      v.<br><br>ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL LLC, and ROBINHOOD SECURITIES, LLC,<br><br>             Defendants. | Case No. 3:20-cv-02665<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR DAMAGES**

Plaintiff, Joseph Gwaltney, individually and on behalf of all others similarly situated, brings this Complaint for Damages against Defendants Robinhood Markets, Inc., Robinhood Financial, LLC, and Robinhood Securities, LLC (collectively referred to hereafter as "Robinhood").  In support of this Complaint, Plaintiff alleges as follows:

## I.  INTRODUCTION

1.      Approximately 55% of Americans own stocks.  Most of these stocks are publicly traded on U.S. stock exchanges, the overall performance of which can be tracked by the performance of three key U.S. market indices: The Dow Jones Industrial Average ("DJIA"), the Nasdaq Composite Index ("Nasdaq") and Standard & Poor's 500 Index ("S&P 500").

2.      Investors need access to their investments in public markets, like stock and commodities exchanges, in order to protect their savings.  The ability to actively manage one's portfolio to limit losses and capitalize on depressed markets is essential to prudent investing.

3.      Until recently, Americans who wanted to invest in the stock market had to go to a stockbroker or financial advisor to arrange for orders to be placed on the exchanges.  Attempts to bring trading ability directly to investors had been either too unwieldy, too expensive, or both.  With the spread of PCs and the internet in the 1990's, that began to change.  In 1991 E*TRADE became the first online trading platform to enjoy broad success.  In the years that followed, more companies joined, including TD Ameritrade, Charles Schwab, and Scottrade.

4.      Investors managing their own accounts gained two key benefits.  Investors could now manage their own portfolios from anywhere, without having to wait to get in touch with a live broker, so trades could be executed more quickly and efficiently.  Also, the expense of the live broker was eliminated, which saved investors on fees and commissions.  When Scottrade opened in 1996, it offered trading to clients for a flat fee of $7 per trade.  Since there were no brokers charging commissions on trades, these online trading platforms made their money primarily on the flat trade fees on transactions.

5.      Online trading also brought stock investing to more Americans than ever before.  Prior to the 1990's only 5% of Americans participated in the stock market.  After online brokerage firms

came into being, that number quickly jumped to 20%, and continued to increase steadily throughout the 1990's.  Since then, the number has hovered between 50-60%.

6.      In 2013, Robinhood was founded to compete in the online trading market.  Robinhood attracted clients, in large part, with the promise of free account set up and commission-free trades; a new move in the world of online trading.

7.      Instead of generating income through commissions or fees on trades, Robinhood generates revenue by earning interest on idle cash in investors accounts.  The company offers a premium membership, Robinhood Gold, for $5 per month, that permits margin trading and provides access to market analytical data.  When a client takes a margin credit extension, Robinhood earns interest on those loans.

8.      Robinhood primarily generates revenue by selling its clients' market order flow data to market makers.  When Robinhood receives orders from clients, instead of executing those orders on the exchanges itself, it sells the right to fill those orders to other parties, the market makers, who can then execute the trades privately instead of on the open market in the exchange.

9.      For this right to execute the orders, the market maker gives Robinhood a payment for order flow ("PFOF").  Since Robinhood does not have to execute all the orders itself, and since there is no exchange fee that has to be paid, it keeps costs low and is able to offer free trading.  The market maker can use the order data to make a spread executing the market orders.  They pay Robinhood the PFOF as a "rebate" based on the dollar amount of each trade executed.

10.      Another draw to Robinhood, announced in a blog post on December 12, 2019, is the ability to trade fractional shares of securities.  Many small investors either cannot afford to purchase an entire share of a stock like Berkshire Hathaway, which trades at close to $300,000.00 per share. Fractional share purchasing on Robinhood allows investors to buy as little as 1/1,000,000th of a share or invest as little as $1.

11.      Robinhood has grown rapidly since inception.  The company has raised over $900 million in venture capital through several private offerings and has been valued at approximately $7 billion.  In December 2019, the company announced it had surpassed 10 million accountholders. Robinhood states half of their clients are first-time investors, with a median age of 30.

12. Over the past several weeks, volatility in the U.S. stock markets has dramatically increased, primarily related to concerns over the spread of the COVID-19 virus.

13. Beginning on February 20, 2020, the CBOE Volatility Index ("VIX"), which measures option prices to calculate the market's expectation of 30-day forward-looking volatility, began to rise significantly. The higher the VIX (also called the "Fear Index"), the more volatile markets are likely to be, which means there will be increased trade volume and wider price swings for investments in U.S. markets. After briefly peaking on February 28, 2020, the VIX fell by -16.7% on March 2, 2020, the next trading day. With this drop in fear, U.S. securities markets saw tremendous gains, resulting in the largest single-day point gain ever for the Dow Jones Industrial Average ("DJIA"). The DJIA rose steadily throughout the day, closing up 1,293.96 points: +5.09% higher than the previous close.

14. The next day, March 3, 2020, markets opened lower. After a brief rebound into positive territory, the DJIA sold off -3.6% from its intraday peak to close -2.9% from the previous day's close.

15. The days after saw price swings on major U.S. indices. By the end of the week, the wild swings saw the DJIA change an average of 3.4% per day, up or down.

16. Just before markets opened on Monday March 9, 2020, the VIX spiked up +42.3%: from 41.94 to peak at 59.66 points. This is the highest VIX number since the financial crisis of 2008, and an increase of over +240% from its closing value on February 20, 2020.

17. At the same time, U.S. markets experienced a massive sell-off, which tumbled stock prices. The DJIA opened on March 9, 2020 at -3.4% below its previous close. It immediately fell further until it reached -7% at 9:33AM Eastern Time[1], when NYSE circuit breakers automatically tripped, freezing trading for 15 minutes.

18. During the midst of this turmoil, investors in the market need access to their investments in order to protect their savings. The ability to actively manage one's portfolio to limit losses and capitalize on depressed markets is essential to sound investing. For nearly the entire trading day on March 2, 2020, several hours on the morning of March 3, 2020, and approximately an

---

[1] All times stated herein are in Eastern Standard Time or Eastern Daylight Time, as was in force on the date in question.

1  hour on March 9, 2020, Robinhood's service completely failed, preventing clients, including Plaintiff,

2  from being able to buy or sell securities in their accounts.

3      19.     To add insult to injury, Robinhood's email system also failed, so its clients, rightfully

4  upset and concerned about their accounts, could not get through to the company to get any

5  information, apart from what Robinhood shared on its Twitter accounts and server status page.

6      20.     Robinhood's system failure during these days of record-setting trading comes at the

7  worst possible time for investors and caused its clients to lose millions of dollars.  These failures were

8  not the result of unprecedented market activity, as claimed. Rather, these failures  are evidence that

9  Robinhood's system was not properly designed to handle peak market activity, when needed most,

10  but was focused more on making money for the company than providing service or protection to its

11  clients.

12                              **II. <u>PARTIES</u>**

13      21.     Plaintiff Joseph Gwaltney resides in Duval County, Florida.  At all times relevant to

14  the allegations in this complaint, Plaintiff maintained an account with Robinhood, which he used to

15  purchase, sell, and hold securities using Robinhood's mobile app and website.  Plaintiff was also a

16  Robinhood Gold member, which cost him $5 per month.

17      22.     Defendant Robinhood Markets, Inc. was incorporated in Delaware on November 22,

18  2013.  Its corporate headquarters is located at 85 Willow Street, Menlo Park, CA 94025, which is

19  within the Northern District of California.  Robinhood Markets operates as a financial services

20  holding company.  Robinhood Markets controls wholly owned subsidiary companies that transact

21  business in the securities industry.  Robinhood Markets owns 100% of co-defendants Robinhood

22  Financial LLC and Robinhood Securities, LLC.

23      23.     Defendant Robinhood Financial LLC is a limited liability company, formed in

24  Delaware on August 24, 2012.  Its corporate headquarters is located at 85 Willow Road, Menlo Park,

25  CA 94025, which is within the Northern District of California.  In 2013 Robinhood Financial

26  registered as brokerage firm with FINRA (CRD#: 165998) and the SEC (SEC#: 8-69188).  Currently,

27  and at all times relevant to his complaint, Robinhood Financial continues to operate as a brokerage

28

1    firm regulated by FINRA and the SEC and registered to do business in all 50 U.S. states, the District

2    of Columbia, Puerto Rico, and the U.S. Virgin Islands.

3          24.    Defendant Robinhood Securities, LLC is a limited liability company, formed in

4    Delaware on October 27, 2016.  Its corporate headquarters is located at 500 Colonial Center Parkway,

5    Suite 100, Lake Mary, FL 32746.  In 2017 Robinhood Securities registered with FINRA (CRD#:

6    287900) and the SEC (SEC#: 8-69916) as a brokerage firm.  Currently, and at all times relevant to

7    his complaint, Robinhood Securities continues to operate as a brokerage firm regulated by FINRA

8    and the SEC and registered to do business in all 50 U.S. states, the District of Columbia, Puerto Rico,

9    and the U.S. Virgin Islands.  Robinhood Securities conducts significant business in California.

10                        **III.   JURISDICTION AND VENUE**

11         25.    This Court has original subject matter jurisdiction over this matter pursuant to 28

12   U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), provides

13   federal district courts with original jurisdiction over any class action in which any member of a class

14   is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in

15   the aggregate the sum of $5 million, exclusive of interest and costs.

16         26.    The amount in controversy is unknown at this time, but it is expected that it will exceed

17   $5,000,000.00.

18         27.    Robinhood serves as a broker or dealer to approximately 10 million clients in the

19   United States ("Class Members").  The location of these Class Members is unknown at this time, but

20   they are expected to be present in all states.

21         28.    This Court has personal jurisdiction over Defendants Robinhood Financial and

22   Robinhood Markets because their corporate headquarters are located in Menlo Park, CA, within the

23   Northern District of California.

24         29.    This Court has personal jurisdiction over Robinhood Securities due to their continuous

25   transactions with the related other Defendants that give rise to this claim, and because all Defendants

26   are registered to do business in California, and do, in fact, transact significant business within

27   California and within the Northern District.

28

---

30.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions that give rise to the claims alleged herein occurred in this district, and because Defendants conduct substantial business in this District.  Furthermore, Robinhood Financial and Robinhood Markets have their headquarters in this District.

## IV. INTRADISTRICT ASSIGNMENT

31.     Assignment to the San Francisco division of this district is appropriate under Civil Local Rule 3-2 because a substantial part of the events or omissions which give rise to the claims occurred in the San Mateo County, which is within the San Francisco division.

## V. FACTS

32.     Joseph Gwaltney opened an account with Robinhood sometime before March 2, 2020. He maintained that account at all times relevant to this complaint.

33.     At the time Plaintiff, and all other users, opened a Robinhood account, he accepted by digital affirmation the terms of the Robinhood Financial LLC & Robinhood Securities, LLC Customer Agreement ("Customer Agreement").[2]   The Customer Agreement incorporated by reference the Robinhood Terms and Conditions ("TAC").[3]

34.     The Customer Agreement states that Robinhood Financial operates as the client's broker by providing trading and brokerage services, while Robinhood Securities provides clearing services on all trades.

35.     The Customer Agreement further states that all trade records for client accounts generated by Robinhood Securities are sent to the client, and copies provided to Robinhood Financial. Therefore, all records of trade and account activity are in the possession and control of Robinhood Financial in Menlo Park, CA.

---

[2] A copy of the Customer Agreement is attached hereto as Exhibit A.  This version of the agreement, revised as of February 5, 2020,was, by the terms of the agreement, in force at the time of the events in question.

[3] A copy of the TAC is attached hereto as Exhibit B.  This copy was retrieved on March 16, 2020 from the "Disclosure Library" of Robinhood's website at https://robinhood.com/us/en/about/legal/ and was in force at the time of the events in question.

36.     At close of trading for U.S. Markets on February 28, 2020, Plaintiff had securities and cash valued at approximately $150,000.00 in his Robinhood Gold account.

**A.  <u>The March 2, 2020 Outage</u>**

37.     On the morning of March 2, 2020 at 9:33AM, Robinhood's system failed, preventing all of its clients, including Plaintiff, from accessing their investments.

38.     Plaintiff attempted to access his Robinhood account to manage his investments but was unable to access the account due to Robinhood's service outage.

39.     For the entire trading day on March 2, 2020 the Plaintiff, and all other Robinhood users, were unable to access their accounts or manage their investments while all three major U.S. market indices (the DJIA, Nasdaq Composite Index, and S&P 500 Index) recorded their largest single-day point gains in history, with each index rising at least +4.4% or more.

40.     At 9:38AM on March 2, 2020, Robinhood reported on its status page that they were "Investigating - We are experiencing a system-wide outage. We are working to resolve this issue as soon as possible."

41.     At 11:18AM on March 2, 2020, the page was updated to further state "Identified - The issue has been identified and a fix is being implemented."

42.     At 3:40PM on March 2, 2020, the page was updated, stating: "Update - We are still experiencing system-wide issues. We are continuing to work on resolving this and will provide updates as they become available. All of us at Robinhood are working as hard as we can to resume service."

43.     Finally, at 7:21PM on March 2, 2020, an update first disclosing the email support outage was posted.  It stated: "Investigating - We are experiencing issues receiving emails through our email support system. We are working to resolve this issue as soon as possible. In the meantime, please use https://robinhood.com/contact as the best way to reach us."

44.     During the day of March 2, 2020, Plaintiff attempted to call Robinhood's support telephone number multiple times but was unable to reach anyone.

1   45.     Later that same day, Plaintiff received an email from Robinhood, which stated, "This

2   morning, starting at 9:33AM ET, we started experiencing downtime across our platform. These issues

3   are affecting functionality on Robinhood, including your ability to trade."

4   46.     For all but the first three minutes of March 2, 2020, Robinhood's outage prevented all

5   of its clients from accessing their accounts for an entire trading day.

6   47.     The following morning at 2:19AM, in a series of tweets by its "Robinhood Help"

7   Twitter account, Robinhood publicly announced that "Robinhood is currently back up and running.

8   We're testing through the night, and you may observe some downtime as we prepare for tomorrow."

9   It also stated "[w]e take any interruption in service seriously" and admitted the outage was "not

10   acceptable" to its investor clients.

11   48.     During the March 2, 2020 outage, Plaintiff was unable to access his Robinhood

12   account to manage his investments or transfer funds into or out of his account.

13   **B.   <u>The March 3, 2020 Outage</u>**

14   49.     After trading opened at 9:30AM on March 3, 2020, Robinhood's system crashed

15   again, preventing clients from accessing their accounts.   At 10:11AM Robinhood tweeted, "Our

16   systems are currently experiencing downtime.   We're determined to restore full functionality as soon

17   as possible. We'll be sharing updates here and on status.robinhood.com."

18   50.     Finally, at 11:54AM on March 3, 2020, Robinhood tweeted that its service was "fully

19   restored."

20   51.     During the down time on the Morning of March 3, 2020 the major U.S. indices

21   fluctuated wildly.   The DJIA dropped -1.3% within 30 minutes of the opening bell before gaining

22   +2.6% from that low within ten minutes.   There were four additional point swings greater than 1%

23   by the time Robinhood was again operational.

24   52.     During the March 3, 2020 outage, Plaintiff was unable to access his Robinhood

25   account to manage his investments or transfer funds into or out of his account.

26   53.     During the day on March 3, 2020, Plaintiff again attempted to call Robinhood's

27   support telephone number multiple times but was unable to reach anyone.   Plaintiff eventually

28   resorted to emailing Robinhood support on March 3, 2020 and again on March 6, 2020.

54.     Even after Robinhood's March 3, 2020 outage was resolved, Plaintiff was still unable to access his account until sometime on March 4, 2020.  Plaintiff was informed by a co-worker and fellow Robinhood user that he needed to uninstall and then reinstall the app.

55.     Had Robinhood utilized adequate customer support for its clients by staffing phone lines and returning emails, Plaintiff would have been able to resolve this issue sooner.

**C. The March 9, 2020 Outage**

56.     On Monday March 9, 2020, U.S. markets experienced a huge sell-off, with all three major indices shedding more than -7.4% on the day: the biggest single-day percentage drop for each index since the financial crisis of 2008.

57.     Yet again, Robinhood's system failed at this vital time for investors to have access to manage their accounts, preventing clients from managing their investments.

58.     Robinhood's status page updated at 9:51AM on March 9, 2020, stating: "Investigating - We are experiencing issues with equities, options and crypto trading. We are working to resolve this issue as soon as possible."

59.     At 10:06AM on March 9, 2020, Robinhood Help tweeted: "Trading is currently down on Robinhood and we're investigating the issue. We're focused on getting back up and running as soon as possible and we'll update the status page with the latest status.robinhood.com."

60.     A status page update at 10:30AM on March 9, 2020 stated, "Identified - The issue has been identified and a fix is being implemented."

61.     A series of tweets and status updates beginning at 10:32AM on March 9, 2020 informed users that trading was first "partially restored" on Robinhood for new orders "since at least 10:25 AM ET", but that trading in fractional shares was still unavailable.

62.     Finally, at 3:34PM, Robinhood Help tweeted that "[t]rading has been restored and Robinhood is back up and running again. Thank you for your patience as we resolved this issue." This was only 26 minutes before markets closed on March 9, 2020.

63.     During the outage on March 9, 2020, Plaintiff was unable to access his Robinhood account to manage his investments or transfer funds into or out of his account.

//

### D.  **Robinhood's** *Mea Culpa*

64.     On March 3, 2020 Robinhood's co-founders and co-CEOs posted to the blog page of the company's website regarding the outages.  The post claimed that "unprecedented load" on Robinhood's infrastructure led to a "thundering herd" effect–triggering a failure of our DNS system. The post claimed that the unprecedented load was caused by several factors including "among others, highly volatile and historic market conditions; record volume; and record account sign-ups."

65.     In fact, none of the dates that Robinhood's system failed set records for trading volume.  Market data shows that on all U.S. exchanges combined the volume of shares traded was 14,163,098,470 shares on March 2, 2020, 14,900,627,470 shares on March 3, 2020, and 17,614,290,337 on March 9, 2020.  While these numbers are higher than average, they are not unheard of and are not records.  Trading volume on February 27 and February 28, 2020, just before the outage, far exceeded either March 2 or 3, 2020 with 15,821,612,374 and 19,357,141,449 shares trading hands each day, respectively.  February 28 was the second busiest day in history based on trading volume.

66.     Furthermore, twelve years ago, in 2008 during the market volatility surrounding the financial crisis, there were two days on which trading volume was higher than the volume on any of the dates Robinhood crashed, eleven of which were higher than all but March 9, 2020.  This includes the record for highest trading volume on October 10, 2008, at 19,761,381,116 shares.  Trading volume of this magnitude was foreseeable and Robinhood should have designed its system to handle it.

67.     Since the tweet from 3:34PM on March 9, 2020, as of the date of this filing, Robinhood has issued no further public statement on its twitter accounts or blog regarding any of the outages.

### VI. CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

69.     Plaintiff seeks to represent a class ("the Nationwide Class") defined as:

- All Robinhood account holders and/or users within the United States.

70.     Plaintiff also respectively seeks to represent the following subclasses defined as:

- All Robinhood Gold account holders and/or users within the United States. ("The Gold User Subclass").

- All Robinhood account holders and/or users within the United States who were not able to execute option or futures trades during the outages. ("The Option-Future Subclass").

71.     Excluded from each Class and Subclass are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiff reserves the right to modify or amend these Class and Subclass definitions, as appropriate, during the course of this litigation.

72.     This action has been brought and may properly be maintained on behalf of the Class and Subclasses proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

73.     **Numerosity:**  The members of the Class and Subclasses are so numerous and geographically dispersed that individual joinder of all class members is impracticable.  While Plaintiff is informed and believe that there are not less than ten million members Class and some lesser number of the Subclasses, the precise number of the Class and Subclasses are unknown to Plaintiff, but may be ascertained from Defendants' books and records.  Class and Subclass Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

74.     **Commonality and Predominance:**  This action involves common questions of law and fact, which predominate over any questions affecting individual Nationwide and Statewide Class members, including, without limitation:

   a.   Whether Defendants' trading platform was inadequate to provide the promised services in the face of reasonably foreseeable consumer demand;

   b.   Whether Defendants failed to provide contingencies to customers to execute timely trades in the event of an Outage;

   c.   Whether Defendants violated FINRA Rule 5310;

   d.   Whether Defendants violated state consumer protection laws in failing to disclose that its trading platform infrastructure was inadequate and unable to handle foreseeable high-volume market activity;

e. Whether Defendants were in breach of their legal, regulatory, and licensing requirements by failing to provide adequate access to financial services in a timely manner;

f. Whether Defendants were in breach of their contracts and/or the implied covenant of good faith and fair dealing in connection with their failure to provide financial services in a timely manner;

g. Whether Defendants were negligent or grossly negligent by failing to provide financial services in a timely manner due to its inadequate platform infrastructure and lack of timely any contingency to execute trades in the event of a platform outage;

h. Whether Defendants were unjustly enriched by their conduct;

i. Whether Plaintiff and the other Class Members were injured by Defendants' conduct, and if so, the appropriate class-wide measure of damages, restitution, and other appropriate relief, including injunctive relief; and

j. Whether Plaintiff and the other Class Members are entitled to injunctive and declaratory relief.

75.  **Typicality:** Plaintiff's claims are typical of the claims of the proposed Class and Subclasses in that the Plaintiff was a Robinhood client during the class period and was unable to access or manage his investment account during the outages.  Plaintiff and the other Class and Subclass members suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class and Subclass members.

76.  **Adequacy of Representation:** Plaintiff is an adequate Class representatives because his interests do not conflict with the interests of the other members of the Class or Subclasses that he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation and in securities regulation, and Plaintiff intends to prosecute this action vigorously.  The Class and Subclasses' interests will be fairly and adequately protected by Plaintiff and their counsel.

77.  **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in

the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Class Members to individually seek redress for Defendants' wrongful conduct. Even if the Class and Subclass members could afford individual litigation the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>

### BREACH OF CONTRACT
**(Against Defendants Robinhood Financial LLC and Robinhood Securities, LLC)**

Plaintiff incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein, and further alleges:

78.    The Customer Agreement that Plaintiff and Class Members entered into with Robinhood Financial LLC and Robinhood Securities, LLC is a contract.

79.    This contract was drafted by Defendants and their agents and presented to Plaintiff and Class Members to accept, without modification, if they wished to open an account with Defendants.  There was no negotiation of the terms of the contract.

80.    Defendants furnished consideration to Plaintiff and Class Members in the form of access to Defendants' online trading platform, enabling them to trade securities and options listed on U.S. securities exchanges.  In exchange, Defendants received consideration from Plaintiff and Class Members including but not limited to order flow data, which it sold to market makers to generate revenue, interest generated on cash balances in accounts, interest on margin extensions, and fees for Gold Membership access.   .

81.    During the outages of March 2, 3, and 9, 2020, Defendants breached their contractual duty to Plaintiff and Class Members by failing to provide access to clients' accounts and access to

markets, but still received consideration from Plaintiff and Class Members in the form of order flow data, interest, account fees, and card fees.

82.     Defendants' breach deprived Plaintiff and Class Members of the ability to manage their investments on the three outage days during some of the largest swings in market history.

83.     As a proximate result of Defendants' breach, Plaintiff and Class Members have been damaged in a similar manner.

WHEREFORE Plaintiff demands judgment against Defendants for damages as hereinafter described.

## <u>COUNT II</u>

**BREACH OF IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING
(Against Defendants Robinhood Financial LLC and Robinhood Securities, LLC)**

Plaintiff incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein, and further alleges:

84.     The Customer Agreement that Plaintiff and Class Members entered into with Robinhood Financial LLC and Robinhood Securities, LLC is a contract.

85.     Plaintiff and Class Members entered into this contract with the expectation that Defendants would not do anything to injure the right of Plaintiff and Class Members to receive their benefits of the contract: access to securities markets.

86.     Defendants, through the inadequate design and implementation of their trading platform service and the lack of a contingency plan in the event of an outage, failed to provide the access to securities markets the Plaintiff and Class Members were promised in the Customer Agreement.

87.     Defendants failure to ensure that their system was stable enough to handle high, but foreseeable, market activity, was unreasonable.  Defendants' failure to discharge their contractual responsibilities was

88.     As a proximate result of Defendants' breach, Plaintiff and Class Members have been damaged in a similar manner.

1    WHEREFORE Plaintiff demands judgment against Defendants for damages as hereinafter

2    described.

3                                        **COUNT III**

4                                     **NEGLIGENCE**
                                     **(All Defendants)**
5

6        Plaintiff incorporates by reference the allegations in the preceding paragraphs as if set forth

7    fully herein, and further alleges:

8        89.    Defendants were obligated to exercise a reasonable degree of care, skill, and ability

9    that is ordinarily employed by registered securities broker-dealers when developing and providing

10   trading services to Plaintiff and Class Members, to ensure that Defendants' trading platform was

11   designed to handle foreseeable market fluctuations that could affect system stability, and to provide

12   alternate access to Plaintiff and Class Members in the event of a failure.

13       90.    Through the design, testing, implementation, maintenance, and updating of

14   Defendants' trading platform, this reasonable degree of care should have ensured that the system

15   would not crash on the dates the outages occurred.

16       91.    Further, a reasonably prudent broker-dealer would have provided an alternate method

17   for its clients to manage their accounts in the event of a website and/or application failure that

18   prevented direct trading.

19       92.    Defendants breached their duty to exercise reasonable care by failing to provide

20   Plaintiff and Class Members with a trading platform that could remain operational on the outage

21   dates.  Defendants further breached their duty to exercise reasonable care by failing to provide

22   Plaintiff and Class Members with any alternate means of accessing and managing their accounts when

23   the system failed.

24       93.    As a proximate result of Defendants' negligence, Plaintiff and Class Members have

25   been damaged in a similar manner.

26       WHEREFORE Plaintiff demands judgment against Defendants for damages as hereinafter

27   described.

28

1

2

3

## COUNT IV

**GROSS NEGLIGENCE**
**(Against All Defendants)**

4
5

    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein, and further alleges:

6

7

8

    94.    Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in developing and operating Defendants' trading platform, so as to ensure that the service could handle reasonably foreseeable levels of trading volume and/or client use without crashing.

9

10

11

12

    95.    Defendants breached this duty by failing to develop a service capable of functioning during increased volume that was entirely foreseeable, since equivalent volume had already occurred more than 10 years before the outages that prevented Plaintiff and Class Members from accessing their accounts.

13

14

15

    96.    Furthermore, Defendants breached this duty by having no back-up system to ensure account and market access for clients in the event of a system failure, even though such potential failure was foreseeable.

16

17

18

    97.    The foreseeability of the causes of Defendants' system failure, during the type of market activity that makes certain investor losses due to such outages will be amplified, evidences a conscious disregard for the rights of Plaintiff and Class Members who held Robinhood accounts.

19

20

21

    98.    Defendants' breach of their duty to provide a suitably stable trading platform and backup contingency to its clients directly produced losses for Plaintiff and Class Members.  But for Defendants' breach, Plaintiff and Class Members would not have been damaged.

22

23

    99.    Because of Defendants' gross negligence, Plaintiff and Class Members have been damaged in a similar manner.

24

25

    WHEREFORE Plaintiff demands judgment against Defendants for damages as hereinafter described.

26  //

27  //

28  //

## COUNT V

### UNJUST ENRICHMENT
### (Against All Defendants)

Plaintiff incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein, and further alleges:

100.    By their breach of contract, and by their breach of their duty of care to Plaintiff and Class Members, Defendants obtained benefit from Plaintiff and Class Members.

101.    Plaintiff and Class Members conferred benefit on Defendants in the form of valuable order flow data, income on idle account balances, account fees, interest on margin extensions, and debit card interest and fees.

102.    Defendants were aware or should have been aware of the limitations of their trading platforms and computer systems but failed to adequately warn prospective clients of these shortcomings.

103.    Defendants were aware or should have been aware that such limitations were material considerations that prospective clients would want to consider before using Defendants' services.

104.    It would be inequitable to permit Defendants to retain revenue generated from their contractual relationship with Plaintiff and Class Members, in spite of their failure to perform their duties pursuant to the Customer Agreement, and their failure to warn Plaintiff and Class Members of the dangerous deficiency of their services.

WHEREFORE Plaintiff demands judgment against Defendants for restitution and disgorgement as hereinafter described.

## COUNT VI

### VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL
### REMEDIES ACT ("CLRA") – CAL. CIV. CODE §§ 1750, *ET SEQ.*
### (Against Defendants Robinhood Financial LLC and Robinhood Markets, Inc.)

Plaintiff incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein, and further alleges:

105.    Plaintiff and all Class Members are "consumers" as defined by Cal. Civ. Code § 1761.

106.    Defendants are "persons" which, by advertising, soliciting, offering, and providing a service to Plaintiff and Class Members, engaged in "transactions" intended to result in the sale of "services" to any consumer, as those terms are defined by Cal. Civ. Code § 1761.

107.    Defendants transactions violated the CLRA by knowingly:

   a.   Misrepresenting the characteristics and benefits of the services to be provided, in violation of § 1770(a)(5);

   b.   Misrepresenting that the services to be provided were of a particular standard, quality or grade, in violation of § 1770(a)(7);

   c.   Advertising the services to be provided with intent not to sell them as advertised, in violation of § 1770(a)(9).

   d.   Advertising the services to be provided with intent not to supply reasonably expectable demand, in violation of § 1770(a)(10).

108.    Defendants failed to disclose that the services offered were inadequate to handle foreseeable demand on their trading platform.  At the time of the transactions, Defendants were aware of the capabilities of their own system and were aware, or through the exercise of due diligence should have been aware, that trading volume could, and likely would, exceed what their platform was capable of handling, causing damage to their clients.

109.    Defendants' advertising of their services stated they granted access to markets, but at lower prices than other online trading services.  This advertising led consumers to believe that Defendants offered a service comparable to other providers in the industry, when in fact Defendants' service was deficient in its capacity and had no contingency plan, either electronic or by personal customer service, in the event of a system failure like the outages that occurred.

110.    As a result of Defendants' violations of the CLRA, Plaintiff and Class Members, who would not have used Defendants' services had the limitations and risks been disclosed, have been damaged by losing funds held in their Robinhood accounts, and by other and further ways subject to proof at trial.

111.    Pursuant to Cal. Civ. Code § 1752, remedies available pursuant to the CLRA are cumulative and can be awarded in addition to other applicable statutory or common law remedies.

112.   Pursuant to Cal. Civ. Code § 1780, Plaintiff and Class Members seek injunctive relief commanding Defendants to:

   a.   Adequately disclose to consumers the that the services they provide can fail during trading times, and to fully disclose the risk to consumers in the event of failures such as the outages previously described;

   b.   Implement technical improvements to ensure that such outages cannot occur again during reasonably foreseeable trading volume and to ensure the services offered comply with securities regulations and FINRA Rules;

   c.   Implement some redundant or contingent system by which consumer clients may still access and manage their accounts in the event of another outage such as the ones previously described; and

   d.   Any other such action or relief as the Court deems proper.

113.   Pursuant to Cal. Civ. Code § 1781, a consumer may bring a class action seeking relief provided by § 1780, if the practice has caused damage to other consumers.  Plaintiff alleges that:

   a.   It is impracticable to bring all members of the class before the Court;

   b.   Questions of law and fact common to the class are substantially similar and predominate over questions affecting the individual members;

   c.   Claims and defenses of Plaintiff are typical of those of the class; and

   d.   Plaintiff will fairly and adequately protect the interests of the class.

114.   Contemporaneously with the filing of this complaint, Plaintiff served a notice pursuant to Cal.  Civ. Code § 1782, via a certified letter to Defendants' principal place of business in Menlo Park, CA, return receipt requested, informing Defendants of the particular violations of § 1770 Plaintiff has alleged herein, and demanding that they correct such violations.  Should Defendants fail to respond to Plaintiff' CLRA demand in a satisfactory manner, Plaintiff will amend this Complaint to seek damages after the expiration of the notice period.

115.   Pursuant to California Civil Code § 1780(d), filed concurrently herewith is the Declaration of Jennie Lee Anderson showing that this action has been commenced in the proper forum.

WHEREFORE Plaintiff demands judgment against Defendants for injunctive and equitable relief as described in paragraph 112 above, attorneys' fees, and costs.

**COUNT VII**

**VIOLATION OF THE CALIFORNIA FALSE**
**ADVERTISING LAW CAL. BUS. & PROF. CODE § 17500, *ET SEQ.***
**(Against Defendants Robinhood Financial LLC and Robinhood Markets, Inc.)**

Plaintiff incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein, and further alleges:

116.    Cal. Bus. & Prof. Code § 17500 prohibits a corporation offering to perform services from making or disseminating before the public in this state, or from this state before the public in any state, any statement concerning the services offered…which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

117.    As previously discussed, Defendants were aware of the capabilities of their own system and were aware, or through the exercise of reasonable care should have been aware, that trading volume could, and likely would, exceed what their platform was capable of handling, causing damage to their clients.

118.    Defendants failed to disclose:

    a.    That their system was incapable of handling significant volume and would fail during heavy trading;

    b.    That there was no contingency plan or backup method account access or trade execution in the event of a system failure; and

    c.    That users of their services faced significant risk of potentially unlimited loss in the event of such a failure.

119.    Defendants caused to be made or disseminated from California through this state and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff and other Class Members.

120.    Defendant has violated § 17500 because the misrepresentations and omissions regarding the functionality, reliability, and risk associated with the use of Defendants' services as set forth in this Complaint were material and likely to deceive a reasonable consumer.

121.    Plaintiff and Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In creating and using Robinhood accounts, Plaintiff and Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the functionality, reliability, and risks of the using the Robinhood services.

122.    Defendant's representations turned out not to be true because the Robinhood service was incapable of handling reasonably foreseeable trading activity and prevented clients from accessing and managing their accounts during times when it mattered most.

123.    Had Plaintiff and Class Members known this, they would not have used Defendants' services. Accordingly, Plaintiff and Class Members overpaid for their Robinhood services.

124.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.

125.    Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

126.    The facts Defendants misrepresented or omitted to disclose to Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to use Robinhood services to manage their investments. Had Plaintiff and Class Members known of the deficient system, lack of contingency planning, and extreme risk to their investments, they would not have used Robinhood services, or would have paid substantially less than they did.

127.    Plaintiff and Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

128.    Plaintiff, individually and on behalf of Class Members, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants' unlawful conduct and restore to

Plaintiff and Class Members any money Defendants acquired by unfair competition, including restitution and/or disgorgement of profits, and for such other relief as may be appropriate.

WHEREFORE Plaintiff demands judgment against Defendants for injunctive and equitable relief as alleged herein, and requests that this Court restore to Plaintiff and the other Class Members any money acquired by unfair competition, including restitution and/or disgorgement of profits.

## COUNT VIII

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION
LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*
(Against Defendants Robinhood Financial LLC and Robinhood Markets, Inc.)**

Plaintiff incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein, and further alleges:

129.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair, or fraudulent business acts or practices."

130.    Defendants' conduct violated multiple statutes and the common law, as alleged herein.

131.    Defendants' have violated § 17200 by knowingly advertising, soliciting, offering, and providing Robinhood services which were inadequately designed to handle reasonably foreseeable market activity and had no redundancy or backup procedures, and omitting mention this to consumers.  Further, Defendants failed to warn Plaintiff and other consumers of the risks attendant to a failure of their systems.

132.    Defendants' conduct was unscrupulous, offended established public policy, and was fraudulent.

133.    The harm caused by Defendants' conduct greatly outweighs any benefit to consumers.

134.    Plaintiff and Class Members relied on the misrepresentations and omissions of Defendants with respect to the reliability and lack of greater risk associated with the use of Robinhood services.  Plaintiff and Class Members would not have used Defendants' services, and/or would not have paid as much for them, but for Defendants' misrepresentations and omissions.  As a result of the conduct alleged herein, Plaintiff and Class Members suffered an injury in fact and lost money.

135.    Defendants concealed and failed to disclose material information about the services offered in a manner that was likely to, and in fact did, deceive consumers and the public.

136.    All of the wrongful conduct alleged herein occurred in the conduct of Defendants' business.

137.    Plaintiff, individually and on behalf of the other Class Members, requests injunctive and equitable relief as alleged herein, and requests that this Court restore to Plaintiff and the other Class Members any money acquired by unfair competition, including restitution and/or disgorgement of profits.

WHEREFORE Plaintiff demands judgment against Defendants for damages as hereinafter described.

## COUNT IX

**ALTERNATIVE COUNT FOR**
**VIOLATION OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT – 501.201, *ET SEQ***
**(Against All Defendants)**

Plaintiff incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein, and further alleges:

138.    This claim is an alternative to Plaintiff's claims under California's UCL, FAL and CLRA, and is brought individually, and on behalf of all similarly situated residents of Florida for violations of the state consumer protection act.

139.    Plaintiff and Class Members are consumers, as defined by Fla. Stat. § 501.203(7).

140.    Defendants actively engaged in trade or commerce pursuant to Fla. Stat. § 501.203, by advertising, soliciting, offering, and providing a service to Plaintiff and Class Members.

141.    The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

142.    The federal courts have defined a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers and have defined an "unfair trade practice" as any

1   act or practice that offends public policy and is immoral, unethical, oppressive, unscrupulous, or

2   substantially injurious to consumers.

3         143.   Defendants induced Plaintiff and Class Members to accept the Customer Agreement

4   by promising access to securities markets while omitting to disclose material risks associated with

5   Defendants' services, namely the inadequacy of their trading platform to handle reasonably

6   foreseeable market activity, and the lack of any contingency plan in the event of system failure.

7         144.   These facts are material to a reasonable person's consideration of whether or not to

8   accept the Customer Agreement.

9         145.   Defendants' omission to disclose these facts to Plaintiff and Class Members was

10   deceptive, unfair, and unconscionable, and evidence the fact that Defendants sought only to generate

11   revenue regardless of the suitability of the service they provided.

12         146.   As a result of Defendants' deceptive trade practices, Plaintiff and Class Members have

13   been damaged by losing funds held in their Robinhood accounts, and by other and further ways

14   subject to proof at trial.

15         147.   Pursuant to §§ 501.211(1) and 501.2105, Fla. Stat., Plaintiff and Class Members are

16   entitled to recover reasonable attorneys' fees from Defendants.

17        WHEREFORE Plaintiff demands judgment against Defendants for damages as hereinafter

18   described.

19                **VIII.   <u>PRAYER FOR RELIEF</u>**

20        WHEREFORE, Plaintiff prays this Court will enter judgment as follows:

21   A.    Certifying the Class as requested herein;

22   B.    Awarding Plaintiff and Class Members compensatory damages in an amount to be

23           determined at trial;

24   C.    Awarding Plaintiff and Class Members restitution in an amount to be determined at

25           trial;

26   D.    Awarding Plaintiff and Class Members punitive damages in an amount to be

27           determined at trial;

28   E.    Awarding Plaintiff and Class Members interest, attorneys' fees, and costs;

F.   Awarding Plaintiff and Class Members equitable relief including but not limited to:

    a.   Disgorging profits obtained by Defendants' through the misrepresentations and omissions to Plaintiff and Class Members regarding the sufficiency of their services offered and risks of using said services;

    b.   Ordering Defendants to ensure the infrastructure that supports their services is capable of providing the promised services to clients during all reasonably foreseeable levels of market activity,

    c.   Ordering Defendants to implement sufficient redundancy features to ensure continuation of service should platform outages happen again in the future; and

    d.   Ordering Defendants to amend their client agreements to accurately disclose the capability of their trading platform services and the risks posed to investors using their services; and

G.   Awarding Plaintiff and Class Members such further and other relief as deemed just and proper by the Court.

## JURY DEMAND

Plaintiff demands a jury trial of all issues triable by right by jury.


Dated: April 16, 2020

Respectfully submitted by:

/s/   *Jennie L. Anderson*
JENNIE L. ANDERSON (SBN 203586)
ANDRUS ANDERSON, LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474
jennie@andrusanderson.com

W. DANIEL MILES, III (*pro hac vice* forthcoming)
JAMES EUBANK (*pro hac vice* forthcoming)
LESLIE L. PESCIA (*pro hac vice* forthcoming)
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, Alabama 36104

Telephone: (800) 898-2034
Facsimile: (334) 965-7555
dee.miles@beasleyallen.com
james.eubank@beasleyallen.com
leslie.pescia@beasleyallen.com

*Attorneys for Plaintiff and the Proposed Class*

Case No. 3:20-cv-02665

CLASS ACTION COMPLAINT